**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | **CASE NO:    5:07CR30** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **JUDGE JOHN R. ADAMS** |
| **-vs-** | ) | |
| | ) | **DEFENDANT PAUL MONEA'S** |
| **PAUL MONEA, et al.,** | ) | **MOTION FOR A JUDGMENT** |
| | ) | **OF ACQUITTAL AND/OR NEW** |
| **Defendants.** | ) | **TRIAL AND MEMORANDUM IN** |
| | ) | **SUPPORT THEREOF** |

Now comes Defendant PAUL MONEA, by and through counsel, pursuant to Federal Rules of Criminal Procedure ("Fed. Crim. Pro."), Rules 29(c) and 33, and respectfully requests that this Court grant a judgment of acquittal, or, in the alternative, a new trial. On May 23, 2007, a jury found Mr. Monea guilty as to counts 1, 2, 3, and 4. A memorandum in support of this motion is attached hereto.

Respectfully submitted,
WILLIAM T. WHITAKER, CO., L.P.A.

 /s/ William T. Whitaker_____
William Whitaker # 0007322
Andrea Whitaker # 0074461
190 North Union Street, Suite 301
Akron, Ohio 44304
330-762-0287; 330-762-2669 Facsimile
wrco190@aol.com
Attorneys for Defendant Paul Monea

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was electronically filed this 4th day of June, 2007. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

/s/ William Whitaker
William Whitaker

<u>**MEMORANDUM**</u>

**I.      THE FAILURE TO GRANT A CONTINUANCE AMOUNTED TO A DENIAL OF DUE PROCESS OF LAW AND WAS FUNDAMENTALLY UNFAIR**

Both the Government and Mr. Monea asked this Court to continue the trial for a period of four to five months.  (See Docket 37, 38, and 40.)   The request was based upon the fact that this was a complex case with multiple issues and the continuance would provide the possibility of reviewing, analyzing and preparing for use over 50 hours of surreptitiously recorded conversations as well as voluminous other issues.  That both the prosecution and defense agreed that the continuance was necessary is a clear indication that there was merit to the request.

This Court insisted, however, on proceeding to trial on May 14, 2007, only four months after the original indictment (two months after the superseding indictment) and only two and a half months after production of most of the tapes.  There were technical problems with some of the tapes, which required recopying, and the final tape was not produced until after the trial began.  The fact of the matter is that it was impossible to fully prepare for trial in the amount of time allowed by this Court.  Mr. Monea made this point clear through various motions to continue (Docket numbers 26, 38, 51, 64 and 83).  A final motion was made orally when the defense learned of the existence of the undisclosed tape on the eve of trial (a partial transcript of this tape was delivered on Saturday evening, May 12, 2007).

The continuance should have been granted pursuant to 18 U.S.C. § 3161(h).  There were numerous issues with the recordings.  Most importantly, crucial conversations were barely audible because of either poor recording or background noise.  Attempts were made to enhance the tapes of crucial conversations.  Counsel retained an expert to effect the enhancements but it would have taken more time to do so and the enhancements could not be completed in time to be effective for use at the trial.  Enhancing the tapes was essential to get accurate renditions of the

most crucial evidence at trial. Mr. Monea was deprived of the ability to do so. All of these facts were fully explained in Mr. Monea's motions to continue.

In addition, it was learned (again on the eve of trial) that there was some evidence that the recordings may have been impermissibly edited. The evidence was preliminary and not of the quality that would have supported a definite finding of tampering with evidence. Had a reasonable amount of time been permitted in order to fully explore and analyze all of the issues with the recorded conversations, this possibility could have been fully resolved. Mr. Monea had previously notified the Court that additional time was needed to examine the recordings. One week after trial began further evidence of impermissible editing was developed and the matter was brought to the Court's attention and an additional continuance was sought and denied. This issue will be discussed in greater detail below.

Additionally, the research necessary to effectively prepare for and try this case was extensive. There were critical issues that required extensive research. These included, but were not limited to, law with regard to "promotion money laundering," "concealment money laundering" and "sting money laundering" as well as the legal ramification of the activities of government agents with regard to the entrapment issue and, as it turned out, with the misconduct of the agents. The denial of the necessary additional time denied Mr. Monea the opportunity to effectively deal with these issues.

18 U.S.C. § 3161(h)(8)(A) provides that "[a]ny period of delay resulting from a… continuance on the basis of [the court's] findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial" shall be excluded from the time provided for a speedy trial in 18 U.S.C. § 3161. A Court shall consider, in relevant part, (1) whether the failure to grant such a continuance in the proceeding would be

likely to result in a miscarriage of justice; (2) whether the case is so unusual or so complex, due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by this section; and (3) whether the failure to grant such a continuance would deny counsel for the defendant reasonable time necessary for effective preparation. 18 U.S.C. § 3161(h)(8)(B); <u>United States v. Moran</u>, 998 F.2d 1368 (6th Cir. 1993).

In this case all parties agreed that it was complex litigation and that it would have been appropriate to go to trial in the late summer or early fall. (See Docket 37, 38, and 40)  To rush this case to trial given the nature of the charges and the voluminous amount of work necessary to afford Mr. Monea constitutionally adequate representation was clearly a denial of due process and a "…a myopic insistence upon expeditiousness" over the right to a fair trial.  <u>Bennett v. Scroggy</u>, 793 F. 2d 772, 774, n. 5 (6th Cir. 1986) (citing <u>United States v. Sarafite</u>, 376 U.S. 575, 589, (1964)).  The convictions should be vacated and a new trial granted in which adequate time to fully prepare is afforded Mr. Monea.

## II.    PROSECUTORIAL MISCONDUCT REQUIRES A VACATION OF THE CONVICTIONS AND AN ORDER OF DISMISSAL

This Court is hereby requested to grant this motion to vacate the conviction of Mr. Monea and to enter an order dismissing all charges against Mr. Monea because of the serious misconduct of the Government through its agents.  The actions of the Government, from the moment the agents met Mr. Monea, were improper and designed to entrap Mr. Monea into committing a crime.  It ultimately became an operation to induce Mr. Monea to commit a crime that would result in an enormous windfall for the Government.

In order to accomplish this task the Government agents made false statements in their 302 reports, made false statements in affidavits and ultimately gave, under oath, enormously misleading testimony to the jury that convicted Mr. Monea.

Special Agent John Tanza of the Federal Bureau of Investigation (FBI) met Mr. Monea on March 30, 2006. He was working under the name of John Rizzo and was introduced as a businessman who had operated a number of girlie bars and might be interested in investing in a project Mr. Monea was developing. Tr. 456. Agent Tanza was given <u>no</u> information from which he might conclude that Mr. Monea would have a willingness to engage in any form of money laundering. Nonetheless, Agent Tanza offered to invest money in the project (initially $300,000.00 with the potential of investing up to $2,000,000.00) and immediately began to induce Mr. Monea to take the money in cash in order to begin setting up the elements of the crime of money laundering in violation of 18 U.S.C. § 1956(a)(3). Mr. Monea was reluctant to take cash and said so immediately. He left the meeting with Agent Tanza without agreeing to take the cash and told him he would think about it. The conversation was recorded. (Gov. Trial Exhibit 5). In his 302 of this very first meeting, Agent Tanza lied about this crucial fact (302's are summaries of the agents contacts with individuals and incidents involved in a case). Notwithstanding the fact that Mr. Monea had expressed great reluctance to take cash, notwithstanding the fact that he did not agree to take cash, Agent Tanza wrote in his 302 that Mr. Monea had "no problem with taking cash." (Defendant's Trial Exhibit 1057, not admitted and attached hereto as Exhibit 1 for the Court's convenience.)

The fabrication of the 302 was compounded by the fabrication of Agent Tanza's trial testimony of that first meeting with Mr. Monea. In order to suggest that Mr. Monea should have been aware that the source of his offer of money was some sort of illegal activity, Agent Tanza

claimed he had told Mr. Monea, at lunch, prior to any offer of money, that he needed to legitimize his money; that is, move his money into legitimate businesses.

> 21   Q.   Now, during the luncheon, did you tell him anything
>
> 22   about yourself?
>
> 23   A.   I had made some indications that I had a lot of money,
>
> 24   that I needed to move into legitimate businesses.
>
> Tr. - pp. 136, 137.

That question was asked by the Assistant United States Attorney prosecuting the case and the answer was a complete fabrication because the Agent said, as revealed by the recording of that meeting, no such thing at lunch.  It cannot be claimed to be an inadvertent error because the Agent had listened to the taped recordings just prior to the commencement of trial.

> 20       Q.   And in the course of preparing for trial, preparing
>
> 21       for this case, did you review the recordings that you made
>
> 22       in the course of the investigation of Mr. Miller into this
>
> 23       new subject?
>
> 24       A.   Yes, I reviewed all the recordings.
>
> Tr., p. 123.

The purpose of this fabrication is to falsely suggest to the Court and the jury that Mr. Monea was alerted to the possibility that he was dealing with illegal cash even before the "bait" had been offered as a lure to induce Mr. Monea into accepting it.  This is beyond question impermissible misconduct that denied Mr. Monea a fair trial and due process of law.

The fabricated statements of the agents did not end with the March 30th conversation.  Notwithstanding the fact that Mr. Monea had twice refused to accept investment money from

what was purported to be a questionable source, despite great need for the investment, Agent Tanza, on October 17, 2006 again offered enormous incentive to lure Mr. Monea into the "sting." He offered to produce a buyer, without any request from Mr. Monea, who would be willing to pay millions of dollars for a diamond that was owned by the Monea family trust. And once again Agent Tanza fabricated his 302 and his testimony. In his 302, Agent Tanza wrote:

> "From that location the three traveled to a nearby restaurant to eat lunch. During the Lunch (sic) conversation Monet (sic) informed the UCE that he was in position (sic – should read possession) of the 42+ carat Yellow diamond, that he had previously showed the UCE. Monet (sic) stated that he had created a web sight (sic) called "Goldeneyediamond.com" to market the diamond, Monet (sic) advised that the diamond was originally over 120 carats and that it had a famous history. Monet (sic) offered the UCE a deal. If the UCE could sell the diamond for 15 million the UCE could keep a Million (sic). Also everything over the 15 million the UCE could have 20%. At this time Miller stated that he was the Trustee of the Trust that was set up as the owner of the diamond, and that he, Miller would get 5% of the sale. Monet (sic) explained how he set up the Monet (sic) family trust to protect his assets from the IRS and his problems.
> The UCE advised that they may have someone interested in the diamond but it had to be certified real . . ."
> (Defendant's Trial Exhibit No. 1058, not admitted and attached hereto for the Court's convenience as Exhibit 2.)

In fact, as we now know, "Monet" did not initiate the conversation by saying that he was in possession of the diamond and did not offer the agent "a deal" if he could sell the diamond. Agent Tanza raised the subject of selling the diamond and began the discussion by claiming that he had a buyer "for something else you have." Again, the fabrication served the purpose of masquerading the Government instigation, enticement and inducement to lure Mr. Monea into the "sting."

Agent Tanza continued his fabrication, under oath, at the trial:

22   Q.   And did the subject of Mr. Monea come up?

23   A.   Mr. Miller said that he would be there shortly or he

24   was there, he just showed up.

25   Q.   Okay.  And did you all do something together?

1    A.   Went to lunch at that time.

2    Q.   Okay.  Who went to lunch?

3    A.   Myself, Mickey Miller, and Mr. Monea.

4    Q.   Okay.  And while you're at lunch, what do you discuss?

5    A.   We had a discussion about the diamond, the fact that

6    the diamond was being offered for sale.

7    Q.   Okay.  And what was that discussion?

8    A.   Mr. Monea indicated that the diamond was up for sale.

9    I believe I asked him, I think I may have said for four,

10   because he had previously said he was going to sell the

11   diamond for three or four million so I assumed it was for

12   four million.

Tr. at 180-181.

In fact, Mr. Monea did not bring up the discussion by indicating that the diamond was up for sale.  Agent Tanza raised the discussion by suggesting, out of the blue, not having conversed with Mr. Monea in three or four months, that he, Agent Tanza had a buyer for "something else you have."

The actual recording reveals the subject was raised when Agent Tanza said "I want to talk to you about something else you have that I may have a buyer for. (talking to unidentified

female) are you talented with phones?" (Transcript of that recording, Defendant's Trial Exhibit 1043-C (not admitted and attached hereto as Exhibit 3) (recording admitted as Defendant's Trial Exhibit 1043)). This part of the conversation was intentionally omitted from the recording played to the jury by the Government. The Government's recording begins shortly after this statement. (See Government Exhibit 12A, not admitted and attached hereto as Exhibit 4 for the Court's convenience.)

Agent Tanza was not the only Government Agent to engage in this deceptive misconduct. Agent Mark McMurtry, after listening to a transcript of this recording and discussing the matter with Agent Tanza, swore in an affidavit issued in support of the warrant to arrest Mr. Monea that there was a discussion about the diamond (which from the affidavit, appears to have been initiated by Mr. Monea), that Mr. Monea offered a commission to Agent Tanza to sell the diamond and that <u>then</u> Agent Tanza said he had a buyer for the diamond. Specifically at paragraph 10 of Agent McMurtry's affidavit:

- ¶ 10 Oct. 17: "The three traveled to lunch during which MONEA showed UCE what he represented to be a 43 karat diamond that MONEA was attempting to sell. MONEA who had spoke (SIC) to UCE 3124 about the diamond at a previous meeting, advised UCE 3124 that he would provide a commission to UCE 3124 **if** UCE 3124 could find a buyer for the diamond. UCE 3214 advised that since the last time UCE 3124 had seen MONEA he had talked to a possible buyer for the diamond." (Emphasis added.)

Affidavit of Agent McMurtry attached hereto as Exhibit 5. (Docket No. 1)

There is no doubt about the juxtaposition of the statements in this affidavit. Both agents are acutely aware that whether the suggestion for selling the diamond came from the Government or the defendant is a crucial element in making the determination of whether there

was entrapment in all cases. Nonetheless, Agent McMurtry continued to mislead during his testimony at trial. When asked directly whether it was a fact that Agent Tanza had been the first one to raise the issue of selling the diamond, Agent McMurtry, despite the fact that he claimed to have reviewed the tape just prior to trial, suggested Mr. Monea began the discussion about the diamond:

> 3 Q    And you are aware of the fact, the truth of the
>
> 4 matter, UCE 3124 had already said he had a buyer for the
>
> 5 diamond, are you not?
>
> 6 A    I believe he said early on that he had. When it
>
> 7 came up about they were talking about four million, there
>
> 8 was a discussion about the provenance of the diamond.
>
> 9 Mr. Monea or Mr. Miller brought up the price of $15
>
> 10 million. UCE 3124 said he had talked to some people who
>
> 11 might be interested. Later on there was discussion about
>
> 12 the amount of money that would be paid should the diamond
>
> 13 be sold through Mr. Rizzo.

McMurtry Tr., p. 4. (Because Mr. Monea's copy of this testimony is not sequentially paginated in conformity with the entire transcript, a copy of this portion attached hereto as Exhibit 6.)

The false information that it had been Mr. Monea's idea for the Agent to sell the diamond was also urged upon the Court, by the Government in its trial brief. At page 10:

> "They went to lunch [on Oct. 17th]. During that lunch, UCE was shown a 43 carat (SIC) diamond and again was told the story about the diamond. Rizzo was asked <u>if he knew anyone who would be interested in buying the diamond</u> for $15 million. They had a discussion about money in the Cayman Islands. There was a

discussion about the undercover agent's people being interested in the diamond and 'Rizzo' indicated that they were going to want to see it." (Emphasis added.) (Docket 75.)

The repeated attempts to mislead the Court and the jury is unquestionably a denial of the fundamental fairness that underlies even the most basic notions of due process. Whether the jury was convinced by the false testimony or whether the falseness was exposed in cross examination despite the obfuscation by the agents is not a question that should be permitted to exist in the American system of Justice. This misconduct in the prosecution of a criminal case by the United States of America requires a vacation of the conviction and the dismissal of the charges.

Courts have recognized that a due process violation may result when the government's enforcement techniques reach a certain level of outrage. *See* United States v. Tobias, 662 F.2d 381 (5th Cir. 1981) (recognizing that government involvement in criminal schemes can be so outrageous that it offends due process.)

## III.    ENTRAPMENT AS A MATTER OF LAW HAS BEEN ESTABLISHED

At the end of the Government's case and again at the end of his own presentation of evidence, Mr. Monea moved this Court for an acquittal on the basis of entrapment as a matter of law. The Court refused that request. Mr. Monea now requests that the Court grant a judgment of acquittal based on entrapment as a matter of law.

In United States v. Pennel, 737 F.2d 521, 534 (6th Cir. 1984) the Sixth Circuit conclusively stated that a Court may find entrapment as a matter of law upon a finding of the Government's suggestion of the crime and a lack of predisposition of the defendant. This case has been more recently relied upon by United States v. Johnson, 2000 U.S. App. LEXIS 22723 (6th Cir.) and United States v. Ng, 26 Fed. Appx. 452 (2001).

The Supreme Court found entrapment as a matter of law in <u>Sherman v. United States,</u> 356 U.S. 369 (1958). in which the Court held that the defendant had been entrapped as a matter of law. The Government agent repeatedly and unsuccessfully coaxed the defendant to buy drugs, ultimately succeeding only by playing on the defendant's sympathy. The Court found lack of predisposition based on the Government's numerous unsuccessful attempts to induce the crime, not on the basis of preliminary contacts with the defendant.

"The function of law enforcement is the prevention of crime and the apprehension of criminals. Manifestly, that function does not include the manufacturing of crime." <u>Sherman v. United States</u>, 356 U.S. 369(1958). And that is what happened here. The question on the issue of entrapment for this Court is not what Mr. Monea thought about this perfect set up, – the agent from Miami with Spanish accent, sumptuous breakfast in a suite, offers of big cash, etc.- the question is how he got there. In other words, whether Mr. Monea was a money launderer waiting for the opportunity to launder funds or whether he was someone who was not even thinking about such a thing and was induced by an idea originating with the Government and enticed and instigated after showing great initial reluctance.

The question here is not a close one. Despite Mr. Monea's apparent great need for funds, the initial (and what should have been the last) offer to invest $300,000 was met with reluctance. Mr. Monea indicated that he did not know if he could "do cash." "Let me think about it." In this first meeting, "Rizzo" suggested investing money before Mr. Monea was given any indication that there was anything unusual or suspicious about how "Rizzo" made his money. In fact, Mr. Miller testified that he introduced Mr. Rizzo to Mr. Monea as a man who owned bars. May 18, 2007 Tr., p. 145. At this point, there was not one scintilla of evidence that there was one bit of predisposition that he did anything wrong.

Moreover, after Mr. Monea explored all the ramifications of the tempting offer ("legitimize" – "get a stream of income") and found out that "Rizzo" might have two million dollars to invest, Mr. Monea never took a single penny. The magnitude of this type of inducement, especially considering Mr. Monea's situation at the time, only serves to highlight the clear reluctance of Mr. Monea to participate in the illegal activity proposed by "Rizzo." That is all that is required of Mr. Monea. He does not need to decide not to commit the crime because it is wrong or because he objects to it. He may choose not to engage in the conduct because he is afraid of being arrested. One of the most important purposes of our laws is their deterrent effect. All that matters is that he chooses not to engage in any further discussions or take any money from "Rizzo."

However, the Government had only just begun its repeated inducements. Thereafter, "Rizzo" offered cash to launder through West Coast Customs and claimed to be a drug dealer looking to launder money. That is, of course, after "Rizzo" invited himself to California. However, Mr. Monea never touched this scheme proposed by the Government and, in fact, "Rizzo" never found out whether Mr. Monea even presented the idea to the owner of West Coast Customs. The Government, in effect, has proven beyond a reasonable doubt that Mr. Monea did not choose to engage in any suggested illegal conduct and that he had demonstrated tremendous reluctance.

Certainly, the Government should have, at this point, stopped attempting to induce Mr. Monea to commit a crime. Yet, the Government continued its pressure on Mr. Monea. After months of no contact and no interest by Mr. Monea to do any business with the "Rizzo," "Rizzo," out of the blue, told Mr. Monea that he thought that he had a buyer for his diamond. Defendant's Exhibit 1043 C; May 18, 2007 Transcript, p. 24-27. This was after twice having

refused "Rizzo's" suggested investments. If you read the affidavit, if you listen to the testimony that the government played, you would think that Mr. Monea raised the idea of "Rizzo" selling the diamond. But, in fact, as is made clear when you listen to the actual recording that Mr. Monea introduced into evidence, including the portion immediately prior to the portion played by the Government, "Rizzo" initially brought up the diamond and stated that he had a buyer that is interested. (See the prosecutorial misconduct section of this memorandum, above, for more detail on this point.)

 "Rizzo" initiated the idea that he would provide Mr. Monea with $15 to 17 million dollars by buying the diamond and later, again totally initiated by the Government, offered to sweeten the deal by including the Tyson house in the total package.

This is a classic fact pattern for entrapment as a matter of law. In fact, it is hard to imagine a more perfect pattern of entrapment. It is the role of the Court to insure the Government does not cross the line of prosecutorial excess and not require the jury to overcome the Miami Vice scenario created by the Government, with its natural appeals to revulsion in the minds of our lay citizens. The Court cannot take a chance that the jury will be influenced by the appeals influenced by the Government's creation of a drug kingpin scenario when it was entrapment from the outset.

There are two related elements in order to establish a valid entrapment defense: (1) government inducement of the crime and (2) a lack of predisposition on the part of the defendant. Mathews v. United States, 485 U.S. 58, 63 (1988). When the Government's deception actually implants the criminal design in the mind of the defendant, the defense of entrapment comes into play. United States v. Russell, 411 U.S. 423, 436 (1973). Once entrapment is placed in issue, the government must prove beyond a reasonable doubt that the

defendant was predisposed to commit the offense. <u>Jacobson v. United States</u>, 503 U.S. 540, 548-49 (1992); <u>United States v. Johnson</u>, 855 F.2d 299, 303 (6th Cir. 1988).

Predisposition to commit the crime must exist <u>prior to the Government's inducement</u>. In <u>United States v. Lasuita</u>, 752 F.2d 249 (6th Cir. 1985), the Sixth Circuit reversed a conviction when the district court answered "No" to the jury's question as to whether the Government has to prove beyond a reasonable doubt that the defendant was ready or willing to enter into an illegal act "prior to his contact" with the Government agents. <u>Lasuita</u>, 752 F.2d at 252. "The defense of entrapment precludes conviction when there is no evidence of defendant's predisposition to commit the crime and the criminal conduct was 'the product of the creative activity of law enforcement officials.'" <u>Lasuita</u>, 752 F.2d at 253 (quoting <u>Sherman v. United States</u>, 356 U.S. 369, 372 (1958)). By responding in the negative to the jury's question, the trial court told the jurors that the Government was not required to prove that the defendant was ready and willing to commit the crime *prior to* contact with the Government agents. This is what the Sixth Circuit found objectionable. The Court found that the critical time for the existence of a defendant's predisposition is the time when the criminal opportunity is presented to the defendant. "[T]he prosecution must show that the defendant was willing to commit the offense at the time when the government agents initially contacted the defendant to propose the wrongful conduct. The agents may not take a defendant who <u>is initially</u> truly unwilling to commit the offense and then induce him to become a criminal." Id.

In <u>Blankenship</u>, 775 F.2d 735 (6th Cir. 1985), the Sixth Circuit found that where entrapment is in issue evidence of prior crimes is not relevant unless it tends to prove that defendant was engaged in illegal operations in some way similar to those charged in the indictment. The other crimes must be substantially similar to the offenses charged. The Sixth

Circuit discussed other factors relevant to determining the defendant's predisposition in United States v. Hernandez, 31 F.3d 354 (6th Cir. 1994). Other factors included: whether the suggestion of the criminal activity was initially made by the Government; whether the defendant was engaged in the criminal activity for profit; whether the defendant evidenced reluctance to commit the offense, overcome only by repeated Government inducement or persuasion; and the nature of the inducement or persuasion supplied by the Government. Whether the defendant demonstrated reluctance to engage in the criminal activity that was overcome by repeated government inducement or persuasion has been held by the Sixth Circuit as being the most important factor in determining the lack of predisposition as a matter of law is. United States v. McLernon, 746 F.2d 1098, 1111, 1113 (6th Cir. 1984).

The Government cannot be heard to argue that eventually Mr. Monea was eager to conclude the deal and, therefore, he was predisposed to launder money. The defense of entrapment exists because the law recognizes that repeated inducement may overcome initial reluctance to commit crime. Our laws provide that that inducement should not come from the Government. The Government must have evidence of predisposition before it dangles the inducement before the individual being asked to commit a crime.

While entrapment is often a question for the jury, this is not such a case. The tapes establish conclusively that the crime was suggested and initiated by the Government, again and again. On its own, the Government offered Mr. Monea up to seventeen million dollars, asking him to take cash, at a time when he had conclusively established a great reluctance to do so. He had, in fact, outright refused to launder previously offered cash. The Government, because of these facts, is "precluded from a conviction" (see Lasuita above) of Mr. Monea.

## IV.  THE FAILURE TO PROPERLY INSTRUCT THE JURY ALSO REQUIRES VACATION OF THE CONVICTION AND THE GRANTING OF A NEW TRIAL

The jury instructions were deficient and, in fact, allowed the jury to believe that a previous conviction alone, regardless of whether it was in anyway similar to the activity the Government was trying to induce, was sufficient to establish that the defendant was already willing to participate in the activity.  This is simply not the law.

The Government in this case attempted to convince the jury of this very fact: that because Mr. Monea had a previous conviction he was already willing to launder money. Agent Tanza's reference to Mr. Monea's tax conviction as a basis for concluding that Mr. Monea was predisposed to commit money laundering and jury instructions' failure to deal with that fact create a denial of due process of law and it is reversible error.   When entrapment is in issue, evidence of prior crimes is not relevant unless it tends to prove that defendant was engaged in illegal operations in some way similar to those charged in the indictment.  The other crimes must be substantially similar to the offenses charged.  <u>United States v. Blankenship</u>, 775 F.2d 735 (6th Cir. 1985).  In <u>Blankenship</u>, the Sixth Circuit found that where entrapment is in issue evidence of prior crimes is not relevant unless it tends to prove that defendant was engaged in illegal operations in some way similar to those charged in the indictment.  The other crimes must be substantially similar to the offenses charged.  This Court refused to instruct the jury on this important point because the specific instruction requested was not contained in the Pattern Jury Instructions.  The Pattern Jury Instructions, however, are simply guidelines and it is noted that guidelines cannot cover every situation.  It is up to the Court to instruct the jury on the law. Here, the law is undisputed.  In order for a previous conviction to establish evidence that a defendant already possessed a willingness to engage in a specific illegal activity that previous

conviction must be of a similar activity. An instruction on this clear and unequivocal law was particularly necessary given the facts of this case. The testimony offered by Agent Tanza mandated an explanation of this legal principle.

During Agent Tanza's cross examination, the following exchange occurred:

3   A.   Excuse me.  There was one other indication that he

4   might have been a money launderer.

5   Q.   Oh.

6   A.   During that conversation, he explained to me that he

7   had gone to prison and that he had a lot of problems with

8   the government and a lot of money that was involved in that,

9   in going offshore to Cayman Islands bank accounts and

10   indications like that so at that time –

11   Q.   He said that during lunch?

12   A.   Yes.

***

19   A.   Yes, he said that during the lunch.

20   Q.   He was very clear that it was a tax case, right?

21   A.   It was a tax case.  I think he may have said that they

22   wanted to charge him with other things, too.

23   Q.   You think?  And you listened to this last night and

24   you think he said that?

25   A.   Yes.

Tr., p. 321.

The clear implication here is that the fact of Mr. Monea's tax case was considered by Agent Tanza in determining whether Mr. Monea was predisposed to commit money laundering. Pursuant to <u>Blankenship</u>, this is not a proper consideration and the jury should have been instructed on this issue. Mr. Monea requested the following instruction:

> During the testimony of FBI Agent Tanza, he discussed Mr. Monea's previous tax conviction as evidence that Mr. Monea was predisposed to commit money laundering. However, I am instructing you that you may not consider such evidence when determining if Mr. Monea was predisposed to commit money laundering. Evidence of prior crimes is not relevant unless it tends to prove that Mr. Monea was engaged in illegal operations in some way similar to those at issue here.

The failure to give this instruction requires a reversal of the conviction and a new trial.

It was also error for the Court not to instruct the jury that the Government must have evidence that a defendant is already willing to engage in the illegal activity suggested before it tempts him with an opportunity that requires illegal conduct. The purpose underlying the defense of entrapment is to insure the offer of the Government, given its allure of financial security, does not itself create the willingness to engage in the suggested activity. This case presents a scenario for just that fact. Mr. Monea, despite dire financial straits, managed to refuse the allure of great financial gain because it required illegal activity. The temptation was there, he asked questions, but he ultimately refused the cash. The offer itself created the temptation in someone about whom there was no evidence to suggest a prior willingness to engage in such activity. It was only when, after Mr. Monea showed great reluctance to engage in the activity, that the Government offered temptation to engage in a sale that would increase his financial benefit to the millions that Mr. Monea agreed to activity that the Government had structured as a violation of law.

The jury should have been instructed that there had to be some evidence that Mr. Monea was already willing to engage in the activity before the Government attempted to induce him to do so. The failure to give such an instruction requires a reversal of the conviction and a new trial.

## V.  MR. MONEA DID NOT VIOLATE 18 USC § 1956(h) BY CONSPIRING TO LAUNDER MONEY IN VIOLATION OF 18 USC § 1956(a)(1)

Mr. Monea should not have be convicted of conspiring to violate 18 USC § 1956(a)(1) when, in fact, the money to be used to purchase the diamond and the house were not the actual proceeds of illegal activity.

"Under the terms of the money-laundering statute, the government must demonstrate beyond a reasonable doubt that the alleged money-laundering transaction 'in fact involves the proceeds of specified unlawful activity[.]' 18 U.S.C. § 1956(a)(1)." United States v. Nickson, 127 Fed. Appx. 770, 773 (6th Cir. 2005). See also, United States v. Johnson, 26 Fed. Appx. 441 (6th Cir. 2001). A critical element of 18 U.S.C. § 1956(a)(1) is the words "in fact." To assert criminal liability under 18 U.S.C. § 1956(a)(1), the government must aver that the laundered funds were actually ("in fact") proceeds from unlawful activity.

Mr. Monea was charged in Count 1 with conspiring to violate 18 U.S.C. § 1956(a)(1) which is a violation of 18 U.S.C. § 1956(h). However, the funds alleged to be laundered in Count 1 were not derived from unlawful activity as required by 18 U.S.C. § 1956(a)(1). It was, of course, Government money. Mr. Monea can no more be convicted of conspiring to violate 18 USC § 1956(a)(1) than of conspiring to violate any other crime such as stealing cars. The

Government did no prove that Mr. Monea ever conspired to launder money that was in fact the proceeds of illegal drug sales.

18 U.S.C. § 1956(a)(3) specifically allows prosecutions in undercover money laundering "sting" operations for funds "represented" to be proceeds from unlawful activity. Laundering government money is not an offense under 18 U.S.C. § 1956(a)(1). The Government's failure to allege this essential element of the underlying money-laundering offense pursuant to 18 U.S.C. § 1956(a)(1) necessitated this Court dismissing that Count.

The Government opposed Mr. Monea's motion to dismiss Count 1 by relying on the Fifth Circuit decision in <u>United State v. Adair</u>, 436 F.2d 520 (5th Cir. 2006). However, that decision offers no law to support its conclusion. It reaches a conclusion contrary to the plain language of the statute and this Circuit's case law which holds that 18 U.S.C. § 1956(a)(1) requires that the laundered funds were actually ("in fact") proceeds from unlawful activity. This Court should reject <u>Adair</u> and find that the Mr. Monea should not have been convicted of Count 1 because the funds alleged to have been laundered were not actual proceeds from unlawful activity. That conviction should be vacated and a judgment of acquittal should be entered.

## VI. THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE AND WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE

### A. <u>There Was No Conspiracy To Conceal Or Disguise The Nature, Location, Source, Ownership, Or Control Of The Money To Be Used To Purchase The Diamond And The House</u>

The evidence did not support a conviction on Count 1 because the Government offered no evidence that Mr. Monea knew that the purchase of the house and the diamond were structured to conceal or disguise the nature, location, source, ownership, or control of the money to be used. In fact, the evidence was clear that Mr. Monea was told by his attorney that a wire

transfer would identify the source of the money, how much was wired and where the money went when it left the attorney's trust account.

Moreover, the exhibits offered at trial (See Defendant's Exhibits 1047-1049) clearly identified the purchaser of the home and the owner of the boat to be provided to Mr. Monea as part of the purchase price. It was represented by the Government during the course of the alleged conspiracy that the purchaser of the home would live in there. Additionally, the Government also alleged that the purchaser of the home and the diamond was the owner of the boat to be provided. The documents prepared by Mr. Monea's attorney clearly identified the owner of the boat as Anthony Vellareal and, therefore, the purchaser of the diamond and the house. There was no evidence presented to establish that Mr. Vellareal was not the actual purchaser.

Therefore, both the wire transfer and the documents underlying the purchase of the diamond and the house did not, in fact, conceal either the purchaser of the house and the diamond or the source of the money being wire transferred.

B. The Wire Transfers That Are The Subject Of Counts 2 Through 4 Were Not Done To Conceal Or Disguise The Nature, Location, Source, Ownership, Or Control Of The Money To Be Used To Purchase The Diamond And The House

In order to for the jury to reach a verdict of guilty on Counts 2 through 4, the Government was required to prove that Mr. Monea *intended* that the wire transfers that occurred on November 9, 17, and 20, 2006 were structured to conceal or disguise the nature, location, source, ownership, or control of the money to be used to purchase the diamond and the house. Unlike a conviction under 18 U.S.C. § 1956(a)(1), a conviction under 18 U.S.C. § 1956(a)(3) requires that Mr. Monea *intended* to conceal or disguise the nature, location, source, ownership, or control of the money to be used to purchase the diamond and the house.

These wire transfers that were the subject of Counts 2, 3, and 4 were for $50,000, $45,000 and $5,000, respectively. The money was earnest money in anticipation of the sale of the diamond. Mr. Monea requested that he be provided with the earnest money since he had other potential buyers. The evidence demonstrated that Mr. Monea wanted the earnest money to be sent in one single payment of $100,000.00. The evidence further demonstrated that Mr. Monea also had informed "Rizzo" that he did not need the earnest money at one point. It was the Government's decision, contrary to the wishes of Mr. Monea, that the money be sent in three separate payments, thus creating three separate charges.

C.  The Government failed to produce sufficient evidence <u>That Mr. Monea Was Already Willing To Engage In The Government Suggested Activity Before He Was Induced To Do So By The Government. The Weight Of The Evidence Clearly Establishes That Mr. Monea Was Not Already Willing To Engage In This Activity Prior To The Inducement And Instigation By The Government.</u>

The facts in support of this proposition are clearly established in the section of this memorandum on entrapment as a matter of law. It must be remembered, however, that the failure to prove beyond a reasonable doubt that Mr. Monea was already willing to engage in money laundering before he was induced to do so by the Government requires a reversal of the convictions. As is demonstrated by the evidence discussed above, the Government clearly failed to establish this fact beyond a reasonable doubt. The weight of the evidence clearly establishes that Mr. Monea was not already willing to engage in money laundering as he had twice previously refused to engage in such behavior despite enormously tempting offers by the Government.

D.  <u>The Law On Weight And Sufficiency</u>

"In reviewing claims for sufficiency of the evidence to support a conviction, this court, while reviewing the record in the light most favorable to the prosecution, should grant relief only if it is

found that upon the record evidence adduced at the trial, no rational trier of fact could have found proof of guilt beyond a reasonable doubt." United States v. Abner, 35 F.3d 251, 253 (6th Cir. 1994) (reversing on ground that evidence of willfulness was insufficient). "The standard, however, is not so heavily weighted in favor of the prosecution that in ruling on a [motion for a judgment of acquittal] the Court must blindly and uncritically accept that every inference the prosecution argues can reasonably be drawn from the circumstantial evidence in the record." United States v. General Electric Co., 869 F.Supp. 1285, 1290 (S.D. Ohio 1994) "[O]nly reasonable inferences may be drawn in the prosecution's favor . . . ." Id. "Rule 29(a) performs a vital function in a criminal case of protecting the defendants from conviction on the basis of inadequate evidence." United States v. Ubl, 472 F.Supp. 1236, 1237 (N.D. Ohio 1979).

"In evaluating a Rule 33 motion based on the weight of the evidence, unlike a sufficiency claim, the trial judge can consider the credibility of the witnesses and the weight of the evidence to insure that there is not a miscarriage of justice." United States v. Solorio, 337 F.3d 580, 589 n.6 (6th Cir. 2003). A defendant is entitled to a reversal because the verdict is against the manifest weight of the evidence if "the government has presented sufficient evidence to convict, but the judge disagrees with the jury's resolution of conflicting evidence…" United States v. Lutz, 154 F.3d 581, 589 (6th Cir. 1998).

The convictions in this case must be reversed and a judgment of acquittal entered because there is both insufficient evidence to sustain a conviction and the convictions are against the weight of the evidence.

## VII.    MR. MONEA'S CONSPIRACY CONVICTION IS IMPROPER AS THERE WAS NO EVIDENCE THAT HE CONSPIRED WITH ANYONE EXCEPT A GOVERNMENT AGENT

The Government offered no evidence that Mickey Miller was engaged in a conspiracy to launder money as it relates to the sale of the diamond and the home belonging to Mike Tyson.

Mr. Miller testified that he "assumed" that the purchasers of the diamond and the house were drug dealers. However, there was no evidence that he "knew" that the transaction was designed to conceal the nature of the source of the funds. In fact, Mr. Miller testified that he had nothing to do with setting up the sale or negotiating the terms of it. The only money laundering he had ever been involved with, according to the evidence, was when "Rizzo" would bring him cash that he would deposit into his business and return as "paychecks" for Rizzo.

If Mr. Miller's knowledge of the sale of the diamond and the house to a drug dealer was all that was needed to establish the conspiracy alleged in Count 1, then the Government may have met its burden. However, more was necessary. As this Court is aware, the conspiracy alleged in Count 1 is one to accept money knowing that it is the proceeds of illegal activity knowing that the transaction was designed to conceal the source of the funds or to avoid a reporting requirement. The Government offered no evidence of reporting requirements that were avoided or intended to be avoided. The final criminal purpose available to the Government to establish a conspiracy in Count 1 is that the transaction was designed to conceal the source of the funds.

There simply was no evidence that Mr. Miller joined in a conspiracy to conceal the source of the funds being used to purchase the diamond and the house. In fact, as noted above, Mr. Miller expressly stated that he was not involved in negotiating how the sale would occur. Moreover, he stated that he was happy that the sale would be conducted through the attorney's trust account so that everything would be done right. Mr. Miller evidenced a desire for the sale of the diamond and the house to be done in a dramatically different fashion than his dealings with the alleged drug dealers.

**VIII.   THERE IS EVIDENCE THAT THE TAPED CONVERSATIONS MAY HAVE BEEN IMPROPERLY EDITED DENYING MR. MONEA A FAIR TRIAL**

Just prior to the closing arguments in this case, Mr. Monea asked for a continuance because he received some evidence that the taped recordings that provided the bulk of the evidence in this trial had been impermissibly edited. Mr. Monea was unable to establish or discover this evidence prior to the beginning of trial. (See the section on the failure to grant necessary continuances above.) Mr. Monea has turned over the evidence he received to this Court. Mr. Monea is continuing to develop substantial evidence as to whether the tapes had been subjected to tampering.

If, indeed, there was some tampering with the tapes, it would be a violation of every notion of due process and require a reversal of Mr. Monea's conviction. This Court is requested to conduct and independent investigation of whether there was tampering and to set the matter for an evidentiary hearing on this issue. The matter should be set for hearing after sufficient time to have the digital recordings examined and analyzed by experts with the credentials to form opinions on the integrity of the tapes and to testify to those opinions.

For the foregoing reasons, Mr. Monea respectfully requests that this Court grant him a judgment of acquittal, or, in the alternative, a new trial.

Respectfully submitted,
WILLIAM T. WHITAKER, CO., L.P.A.

 /s/ William T. Whitaker
William Whitaker # 0007322
Andrea Whitaker # 0074461
190 North Union Street, Suite 301
Akron, Ohio 44304
330-762-0287; 330-762-2669 Facsimile
wrco190@aol.com
Attorneys for Defendant Paul Monea