# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.:  5:07CR30 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN ADAMS |
| | ) | |
| v. | ) | |
| | ) | |
| PAUL MONEA, et al., | ) | **ORDER AND DECISION** |
| | ) | |
| Defendants. | ) | |

This matter comes before the Court on Defendant Paul Monea's Motion for Judgment of Acquittal and/or New Trial ("Motion for New Trial") pursuant to Federal Rules of Criminal Procedure 29 and 33.  (Doc. #104.)  The Government timely filed a Response to the motion. (Doc. #107.)  Defendant has also filed a Motion for an Evidentiary Hearing and a Post-Hearing Brief. (Doc. #177.)  The Government filed a Response to that motion (Doc. #207), to which Defendant filed a Reply ("Reply"). (Doc. #209.)  The Government moved to strike Defendant's Reply.  (Doc. #211.)  Defendant opposed the Government's motion.  (Doc. #213)

The Court has been advised, having reviewed the motions, responses and replies thereto, exhibits, and applicable law.  In an abundance of caution, the Court DENIES the Government's motion to strike Defendant's Reply.  (Doc. #211.)  In addition, finding Defendant's arguments unpersuasive, the Court DENIES his Motion for New Trial for the reasons stated below.

## FACTS

In March of 2006, just after Defendant had been released from prison and while he was on federal supervised release, co-defendant Michael Miller[1] introduced Defendant to Federal

---

[1] Co-defendant Miller had a lengthy history of laundering money and had been the subject of an

Bureau of Investigations Agent John Tanza.  Agent Tanza was posing as John Rizzo ("Rizzo"), an intermediary between drug dealers from South America and persons who were willing to launder money into legitimate businesses for those drug dealers.[2]  After spending several hours with Rizzo, Defendant asked him if he would be interested in investing in a business venture – a website to be titled Tyson House Party ("House Party") that would record the actions of twenty women living at the former estate of Mike Tyson.  The two discussed a monetary investment of approximately $300,000.  Rizzo asked Defendant if he had a problem dealing in cash.  Defendant responded, "Yes and no.  No . . . but I have to qualify that with the fact that I feel that I'm probably under a microscope with the feds right now."  The following exchange occurred during that conversation:

| | |
|---|---|
| Defendant: | So I'd have to . . . we'd have to figure out how I could handle it so that I could . . . |
| Rizzo: | I can't have that.  I can't have anybody looking at . . . |
| Defendant: | Okay, I gotta figure out with you how to do it then so I don't . . . you know . . . so I set up an LLC, capitalize the LLC with cash . . . |
| Rizzo: | How you gonna do that? |
| Defendant: | Well, I'm thinking it through.  I don't know.  The LLC becomes a rental tenant of the trust.  Do you follow me? |
| Rizzo: | No, but as long as it works. |
| Defendant: | Okay. |
| Rizzo: | But my problem is . . . I can't have anybody looking because . . . |
| Defendant: | You don't even have to go there. |
| Rizzo: | Okay. |
| Defendant: | I mean I understand.  I've dealt in cash before. |
| [ . . . ] | |

---

investigation dating back to 2001.  Miller pled guilty in this case to two counts of conspiracy to launder monetary instruments and thirty-five counts of laundering monetary instruments.

[2] Because the transcripts of the recorded conversations refer to Agent Tanza as Rizzo, and Defendant knew him as Rizzo prior to the arrest, the Court will refer to Agent Tanza as Rizzo throughout the fact statement in order to avoid confusion.

| | |
|---|---|
| Defendant: | Let me ask you another question.  You're looking for things that you can put cash money into. |
| Rizzo: | Uh-hmm. |
| Defendant: | That I don't wanna use the word legitimize.  What's the word I'm looking for. |
| Rizzo: | I . . . I don't like that word.  [Laughs.] |
| Defendant: | That gives you . . . that gives you uh . . . interests in legitimate businesses that you can generate a cash flow from so that you have a return on your capital. |

In May of 2006, Rizzo and Defendant went to West Coast Customs, an auto detailing business that Defendant suggested might be interested in funneling cash for Rizzo.  On May 19, 2006, Defendant was recorded in a conversation with Rizzo, in which Defendant introduced the idea of the two doing business together:  "You still want to get together, John, and talk about going into business?"  Defendant provided a number of options, including the House Party idea. The following exchange occurred:

| | |
|---|---|
| Rizzo: | Well to be honest with you, to be frank with you, the guys I know from South America are huge drug dealers.  They're huge drug dealers. |
| Defendant: | Yeah, I don't see any problem with them coming here, buying a car and then paying cash for it . . . |
| Rizzo: | Right. |
| Defendant: | And taking it back to South America or Miami, or wherever they are. |
| Rizzo: | They have it shipped. |
| Defendant: | I don't see that as a problem.  I used to build boats in Miami and I sold half a dozen off-shore power boats to drug dealers for cash. |
| Rizzo: | Okay. |
| Defendant: | And they would come in with a bag of cash.  You don't count the money because you insult them. |

In July 2006, Defendant met with Ken Lanci.  During his conversation with Lanci, Defendant inquired about placing drug proceeds into legitimate businesses and then taking them out, wondering if the money was still "dirty" when it was taken out of the business.  Defendant

again met with Rizzo in October 2006 to discuss the House Party venture.  They also discussed the value and possible sale of a large yellow diamond that Defendant's family trust owned. Defendant expressed concern about taking cash for either transaction, preferring wire transfers.

In November 2006, Defendant and Rizzo had multiple conversations about how and where the purchases would occur.  They also met, along with Scott Ramsey, in Las Vegas, Nevada.  Although Defendant was on supervised release at the time, he had previously received permission to travel to Las Vegas to attend an auto convention.  At that time, Defendant was made aware that the funds he would receive came from drug dealers, and he told Rizzo that he had worked with the mob in a prior business.  They later discussed commissions to be paid to Rizzo, Ramsey, and Miller.  Defendant also instructed the others that the money was to be transferred by wire to his attorney's office.

Defendant was ultimately arrested at his attorney's office while he was waiting for the wire transfer.  That arrest was based upon a complaint filed in this matter in December 2006. The original indictment, returned on January 9, 2007, charged Defendant and co-defendant Miller with four counts:  one count of conspiracy to launder monetary instruments in violation of 18 U.S.C. § 1956(h), and three substantive counts of laundering monetary instruments in violation of 18 U.S.C. § 1956 (a)(3)(B).  Defendant was arraigned on January 22, 2007, a final pretrial was set for March 14, 2007, and a trial scheduled for March 19, 2007.

The Government produced discovery for Defendant and co-defendant Miller.  This discovery included recorded conversations and the transcripts thereof between Rizzo and Defendant and/or co-defendant Miller.  It was clear from the discovery that the investigation of Defendant had begun in 2006 and had continued up to the time of his arrest.  The trial of this

matter lasted from May 14, 2007, to May 22, 2007.  The jury returned its verdict, finding

Defendant guilty on all four counts, on May 23, 2007.

Defendant now cites eight grounds for his Motion for New Trial:

1. The failure to grant a continuance amounted to a denial of due process of law and was fundamentally unfair.

2. Prosecutorial misconduct requires a vacation of the convictions and an order of dismissal.

3. Entrapment as a matter of law has been established.

4. The failure to properly instruct the jury also requires vacation of the conviction and the granting of a new trial.

5. Defendant did not violate 18 U.S.C. § 1956(h) by conspiring to launder money in violation of 18 U.S.C. § 1956(a)(1).

6. The verdict was against the weight of the evidence and was not supported by sufficient evidence.

7. Defendant's conspiracy conviction is improper as there was no evidence that he conspired with anyone except a government agent.

8. There is evidence that the taped conversations may have been improperly edited denying Defendant a fair trial.

The Court notes that it has ruled on all but Defendant's eighth argument on the record in

this matter. However, each of those rulings will be outlined below, in addition to the Court's

ruling on Defendant's claim that the tapes of his conversations were edited.

## LEGAL STANDARD

Motions for a new trial are disfavored and should be granted with caution. *United States*

*v. Seago,* 930 F.2d 482, 488 (6th Cir.1991). "No court wishes a defendant to remain in jail if he

has discovered evidence showing that he is not guilty, but after a man has had his day in court,

and has been fairly tried, there is a proper reluctance to give him a second trial." 3 Charles Alan

Wright et al., Federal Practice and Procedure § 557 (3d ed. 2004).  It is a defendant's burden to

prove that a new trial should be granted.  *United States v. Pierce*, 62 F.3d 818, 823 (6th

Cir.1995) (citing *United States v. Davis*, 15 F.3d 526, 531 (6th Cir.1994)).

**ANALYSIS**

1.  Court's denial of Defendant's motions for continuance of the trial

Defendant argues that his conviction must be vacated because the Court improperly denied both his repeated motions for continuance and his request for a new trial which, if granted, would have allowed counsel to prepare adequately for trial.  Although the Court did grant a continuance of the trial to May of 2007, Defendant's subsequent motions for a continuance were denied on the record and the Court incorporates the reasons for those rulings in this Order.  However, it will further address the argument Defendant has made in the within Motion for New Trial.

Defendant claims that his counsel were not given the opportunity to prepare properly for trial due to the complex nature of the case.  He states that this case required a significant amount of research on multiple issues, including different types of money laundering.  Defendant also claims that his counsel had to review fifty hours of recorded conversations, most of which were not provided by the Government until approximately two and one-half months before trial, and some of which were not produced until shortly before the trial.  Defendant claims that there were critical conversations on those tapes that were barely audible and that he was not able to have the tapes reviewed by an expert in advance of trial or to bring those findings to the Court's attention prior to trial.[3]

The Government responds to Defendant's arguments by pointing out that Defendant was originally indicted with co-defendant Miller in January of 2007 on four counts - one count of conspiracy to launder money and three other counts for substantive offenses of laundering

---

[3] Defendant also claims that, when the defense expert did review the tapes, an impermissible alteration had been made.  The Court will address this argument in its analysis of Defendant's eighth argument.

money.  When the superseding indictment was filed, although co-defendant Miller faced a number of new charges, Defendant did not. Much of the evidence produced at trial consisted of audio recordings.  The Government argues that, in Defendant's case, there were approximately thirty-five hours of recordings that counsel was required to review rather than the fifty hours Defendant claims, but does admit that Defendant did not receive one of the recordings until trial.

The trial in this action was originally scheduled to begin in March of 2007.  However, after the superseding indictment was filed, the Court designated the case complex *only* as to co-defendant Miller, due not to the complexity of the allegations but to the numerous charges that were added and the evidence to be produced in support of those charges.  The Court also agreed to continue the trial date until May of 2007.

The Supreme Court addressed the issue of continuances in *Ungar v. Sarafite*, 376 U.S. 575 (1964), which states:

> The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel. Contrariwise, a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality. There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.

*Id.* at 589 (citations omitted).  A constitutional violation will be found "only if there is an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay.'" *United States v. King*, 127 F.3d 483, 486-87 (6th Cir.1997) (quoting *United States v. Gallo*, 763 F.2d 1504, 1523 (6th Cir. 1985)).  The question is whether the denial resulted in actual prejudice to the defense.  *United States v. Garner,* 507 F.3d 399, 408 (6th Cir. 2007). Actual prejudice can be shown if the continuance "would have made relevant witnesses available or added something to the defense." *United States v. King*, 127 F.3d 483, 487 (6th Cir.1997).

The Court finds that in Defendant's case, another continuance was not necessary. Defendant had only been charged with four counts and those counts were not legally complex. Defendant had multiple counsel on the case, including seasoned criminal defense attorneys. Additionally, this case did not involve a novel issue of law.  The only complication in the case was the many hours of taped conversations, most of which were provided months in advance of trial.  Although one recording was not provided until trial, the mishap did not appear to be intentional and was remedied by the Government as soon as it was discovered that the tape had not been disclosed.  That recording was only one hour long, the Government only offered approximately ten minutes of it during trial, and the Court offered defense counsel additional time to review the tape prior to cross-examination.

Defendant has not demonstrated how he was prejudiced by the denial of his motions. Counsel conducted lengthy cross-examinations of the Government's witnesses and made thorough arguments on the record.  Defendant has not shown that a continuance would have made relevant witnesses available or added to the defense.  The Court finds that Defendant's argument does not support a finding that his due process rights were violated as a result of this Court's denial of his motions for continuances.  Defendant's first argument in support of his Motion for New Trial is without merit.

2.  Prosecutorial misconduct

Defendant claims that the actions of the government agents involved in investigating his case were improper, and that he gave no information to Agent Tanza demonstrating a predisposition to engage in the crime of money laundering, but was entrapped by the Government.  Defendant claims that Agent Tanza gave false statements in the reports he completed about his encounters with Defendant, and that he then made false statements in his

affidavits and under oath at trial that misled the jury.  In his motion, Defendant discusses testimony Agent Tanza gave at trial that Defendant alleges was false.  He further alleges that Agent Mark McMurtry made false statements in his affidavit in support of the arrest warrant and in his trial testimony, and that the Assistant United States Attorney engaged in misconduct by making false statements in his trial brief.  The Government responds to Defendant's arguments by noting that he has taken the allegedly false statements out of context.

Nowhere does Defendant provide the legal standard for demonstrating prosecutorial misconduct.  He simply makes a passing reference to *United States v. Tobias,* 662 F.2d 381 (5th Cir. 1981), which he cited for the proposition that the government's involvement in the criminal scheme was so outrageous that it resulted in a violation of Defendant's due process rights.  In *Tobias*, the defendant alleged that the government agents' involvement in the criminal activity for which they sought to prosecute him was so great that it offended the Fifth Amendment due process guarantees.  This was an extension of the defendant's claim of entrapment, and the court considered the same predisposition evidence as it had considered for his entrapment claim.  *Id.* at 387.  In addition, the court considered whether the activities undertaken by the government agents violated "that 'fundamental fairness, shocking to the universal sense of justice,' mandated by the due process clause of the fifth amendment."  *Id.* at 386-87 (quoting *United States v. Russell*, 411 U.S. 423, 431-32 (1973)).

The Court presumes that Defendant is now attempting to raise a Fifth Amendment due process claim.  The *Tobias* court indicated that governmental infiltration of criminal activity is an acceptable method by which the government can conduct investigations.  *Tobias*, 662 F.2d at 386, citing *Russell*, 411 U.S. at 432.  It continued:

> "This proposition remains true even though the . . . government agent . . . supplies something of value to the criminal."  *United States v. Brown*, 635 F.2d 1207 (6th

> Cir. 1980). This is necessary so that the agent "will . . . be taken into the confidence of the illegal entrepreneurs." *Russell*, 411 U.S. at 432[]. On the other end of the spectrum, however, the government may not instigate the criminal activity, provide the place, equipment, supplies and know-how, and run the entire operation with only meager assistance from the defendants without violating fundamental fairness.

*Tobias*, 662 F.2d at 386.  The *Tobias* court concluded that it was necessary to look at the totality of the circumstances surrounding the crime, including who initiated contact, the amount of contact between the individuals and the government agents, and other factors relevant to the commission of the crime.  *Id.* at 387.

The Court first notes that Defendant addressed, during cross-examination and argument at trial, those inconsistencies he now alleges.  The Court concurs with the Government that Defendant is taking these statements out of context in an attempt to create the illusion that the agents repeatedly made false statements.  Upon review of Defendant's cited authority, the Court concludes that Defendant has failed to demonstrate that the agents' involvement in the crime was so outrageous as to amount to a denial of Defendant's due process rights.

Agent Tanza did not reach out to Defendant. The recorded conversations demonstrate that co-defendant Miller introduced the two.  It was Defendant who first discussed investing in the House Party project.  While it is unclear who discussed the diamond first, it is clear that the agents did not repeatedly goad Defendant into committing a crime, but allowed the possibility for him to do so, which Defendant chose to accept.  The facts surrounding this case are not shocking or offensive to the universal sense of justice, because they demonstrate that Defendant willingly participated in and even proposed various means of executing the money laundering with which he was ultimately charged.  The Court, having interpreted Defendant's claim as a claim of a Fifth Amendment violation, finds his argument to be unpersuasive and without merit.

However, to the extent that Defendant has raised a claim of prosecutorial misconduct by

implicating the actions of the Assistant United States Attorney and his representations in his trial brief, the Court finds that argument to be without merit.  In its review of a claim of prosecutorial misconduct, a court must first consider whether the statements to which the defendant points were improper.  *United States v. Francis*, 170 F.3d 546, 549 (6th Cir. 1999).  In the event that the court determines that the statements were improper, it must then consider whether they were flagrant, an inquiry that requires the court to consider "1) whether the statements tended to mislead the jury or prejudice the defendant; 2) whether the statements were isolated or among a series of improper statements; 3) whether the statements were deliberately or accidentally before the jury; and 4) the total strength of the evidence against the accused." *Id.* at 549-50.

In this case, the Court does not find that Defendant has satisfied his burden of demonstrating prosecutorial misconduct.  Defendant points to no improper statements made by the Assistant United States Attorney in front of the jury, as he cites only to the Government's trial brief.  Furthermore, even if the Assistant United States Attorney were to be held accountable for the statements of the agents on direct examination, any danger of prejudice or confusion was never brought to the Court's attention during the trial, and should have been fully explored on cross examination, for which Defendant's counsel was given ample time.  Defendant's claim of prosecutorial misconduct is without merit.

> 3.  <u>Entrapment as a matter of law</u>

Defendant alleges that Agent Tanza (as Rizzo) entrapped him into committing the crimes with which he is charged, and that there was no evidence presented demonstrating his predisposition to commit the crime of money laundering.  When Defendant met the man he knew as Rizzo, he understood that Rizzo was a business owner who owned a number of bars.  He alleges that the evidence demonstrates that he was reluctant to deal in cash with Agent Tanza in

their initial meeting and wanted to think about the proposition.  Defendant argues that Agent Tanza repeatedly induced him at a time when he was in dire straits financially.  Defendant also claims that it was Agent Tanza who contacted him after months of having no contact and attempted to buy the diamond owned by Defendant's family trust.

"A valid entrapment defense has two related elements: government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in the criminal conduct."  *Mathews v. United States,* 485 U.S. 58, 63 (1988).  To counter a claim of entrapment the Government must produce evidence at trial of the defendant's predisposition to commit the crime.  *Dixon v. United States,* 548 U.S. 1, 43 (2006); *Jacobson v. United States,* 503 U.S. 540, 554 (1992) (reversing the judgment affirming the conviction because "the prosecution failed, as a matter of law, to adduce evidence to support the jury verdict that petitioner was predisposed, independent of the Government's acts and beyond a reasonable doubt" to commit the crime).  "Predisposition, the principal element in the defense of entrapment, focuses upon whether the defendant was an 'unwary innocent' or, instead, an 'unwary criminal' who readily availed himself of the opportunity to perpetrate the crime."  *Matthews,* 485 U.S. at 63 (internal quotations and citations omitted).  Entrapment is generally a question for the jury.  *Id.*

In this case, it was not Agent Tanza who reached out to Defendant.  Co-defendant Miller, who had been under investigation for laundering money and had been working with Agent Tanza (as Rizzo) since 2001, made the introduction.  On May 19, 2006, Defendant and Rizzo had the following conversation:

| Defendant: | How does Mickey show this, the cash coming through?  How does he treat that? |
| Rizzo: | He, he's great.  Because he can, what he does is, he'll go out and buy cars and [W]innebagos . . . that's between me and you on that. |
| Defendant: | Oh yeah . . . [Inaudible] known Mickey a long time.  *He's told me everything about your relationship.* |

(Emphasis added.)  This conversation demonstrates that Defendant was aware of the business relationship that Rizzo had with co-defendant Miller, and that it involved money laundering.

Additionally, it was Defendant who first suggested to Agent Tanza the possibility of investing in the House Party venture.  Defendant expressed skepticism not about the venture itself, but only about accepting cash payments, and that skepticism was rooted in his belief that he was being closely watched due to his supervised release.  Defendant even went so far as to suggest that West Coast Customs act as a conduit for such a cash transaction.  During the May 2006 meeting, Agent Tanza made it clear that he was a broker and that his people were drug dealers.  After receiving that information, Defendant freely discussed how he had previously taken cash from drug dealers when he built boats in Miami.  Defendant also discussed with Ken Lanci the general principals of laundering money.

The Court found at trial that the Government had produced sufficient evidence of predisposition so as to allow a jury to consider the issue of entrapment and to determine that Defendant was predisposed to commit these crimes.  Defendant has produced no new evidence or arguments in his Motion for New Trial that have convinced the Court that he has now proven entrapment as a matter of law.  Defendant's arguments are without merit.

    4.    <u>Jury instructions</u>

Defendant alleges that the jury instructions were deficient in that they allowed the jury to believe that the Government's introduction of his previous conviction for tax evasion was sufficient to establish that he had a predisposition to commit the crimes of which he was accused in this case.  Defendant cites to *United States v. Blankenship*, 775 F.2d 735 (6th Cir. 1985), in which the court stated that evidence of prior crimes is irrelevant when entrapment is an issue

unless it tends to prove that the defendant was involved in illegal activities that were somehow similar to the ones charged in the indictment.

In *Blankenship*, the defendant was charged with illegal possession of a firearm and dealing in firearms, and had previously been convicted of various theft offenses, including receiving stolen property.  *Id*. at 737-38.  The prosecution attempted to introduce evidence of his prior convictions in order to prove predisposition.  *Id*. at 738.  In its opinion, the Sixth Circuit first quoted Fed. R. Evid. 404(b), which states as follows:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

*Blankenship*, 775 F.2d at 739.  Noting that this is a rule of inclusion rather than of exclusion, and that the only excluded use of evidence of prior acts is to prove action in conformity therewith, the court reviewed the inquiry that must be undertaken in determining whether the prosecution has attempted to introduce such evidence for a proper purpose:

> First, [the court] must determine that the evidence is relevant; that is, the evidence must relate to a matter which is "in issue," and must deal with conduct substantially similar and reasonably near in time to the offenses for which the defendant is being tried.  Even if the relevancy criteria are met a trial court has discretion to exclude the evidence if "its probative value is substantially outweighed by the danger of unfair prejudice...." Rule 403, Fed.R.Evid.

*Id.* (citations omitted).  The *Blankenship* court then considered such evidence in the context of an entrapment defense.  It noted that prior acts evidence

> is not admissible to prove a predisposition to commit criminal acts generally. That would be proof of bad character for the purpose of showing that the defendant acted in accordance with such general criminal propensity in the instance charged. The use of such evidence to show predisposition is permitted only when the other crimes are of the same nature as those charged.

*Id.*

In the instant case, the first inquiry, namely whether the evidence has been introduced by the prosecution for an improper purpose, must be resolved in favor of the prosecution.  It was Defendant who first raised the prior conviction in its cross-examination of Agent Tanza, not the Government.  However, in the interests of conducting a thorough review, the Court will proceed to consider whether, if the Government were found to have introduced prior acts evidence, such evidence would require an instruction to the jury other than that which the Court provided.

First, the Court concludes that, according to the reasoning set forth in the *Blankenship* decision, the crimes of tax evasion and money laundering are sufficiently similar that evidence of the tax evasion conviction would have been admissible under Fed. R. Evid. 404(b).  Both crimes revolve around a defendant's attempts to conceal the existence or source of funds from the government.

The Court proceeds, then, to consider the instruction given regarding Defendant's prior acts.  Defendant offered a proposed jury instruction based upon the *Blankenship* decision, which this Court chose not to include in the final charge.  Instead, the charge given by the Court included the following instruction:

> OTHER ACTS OF DEFENDANT
> You have heard testimony that the Defendant committed acts other than the ones charged in the Superseding Indictment.  If you find the Defendant did those acts, you can consider the evidence only as it relates to the Government's claim on the Defendant's intent, motive, opportunity, preparation, plan, knowledge, identity, absence of mistake, or absence of accident.  You must not consider it for any other purpose.  Remember that the Defendant is on trial here only for the crimes charged in the Superseding Indictment, not for the other acts.  Do not return a guilty verdict unless the Government proves the crimes charged in the Superseding Indictment beyond a reasonable doubt.
> In considering objections to jury instructions, the Court must consider "whether the

charge, taken as a whole, fairly and adequately submits the issues and applicable law to the

jury." *United States v. Blood,* 435 F.3d 612, 623 (6th Cir. 2006).  It must be determined whether, viewed as a whole, the instructions "were confusing, misleading, or prejudicial."  *Id.* (quoting *United States v. Harrod*, 168 F.3d 887, 892 (6th Cir.1999)).  "It is not error to fail to use the language requested by the parties if the instruction as given is accurate and sufficient."  *United States v. Horton*, 847 F.2d 313, 322 (6th Cir. 1988) (citing *United States v. Martin*, 740 F.2d 1352, 1361 (6th Cir.1984)).  "[R]eversal is not warranted whenever reasonable jurors *could have* interpreted the instructions given in a way that led them to convict …"  *United States v. Harris,* 200 Fed. Appx. 472, 492 (6th Cir. Oct. 10, 2006) (emphasis in original).

The instruction provided by the Court included the appropriate language derived from Fed. R. Evid. 404(b), and cautioned the jury not to consider the evidence for any other purposes than those permitted under that rule.  It was a proper statement of the law.  The Court did not emphasize the prior conviction, nor did it imply to the jury that the prior conviction was sufficient to demonstrate a predisposition to commit the crime of money laundering.  Therefore, the Court cannot find that the instructions, taken as a whole, were confusing, misleading, or prejudicial.  Defendant's argument regarding the jury charge is without merit.

     5.    <u>Proof of conspiracy count</u>

Defendant alleges that his conviction for conspiring to launder money in violation of 18 U.S.C. § 1956(h) was improper because the money used to purchase the diamond and the house were not actual proceeds from illegal activity.  He argues that the Government was required to demonstrate all of the substantive elements of money laundering in order to prove that he conspired to commit money laundering.  He claims that because the money was supplied by the Government and not by drug dealers, the Government failed to produce evidence sufficient to convict him on this count.

The courts have long recognized that a substantive offense and a conspiracy to commit it are separate creatures, each posing its own threat to society.  *Callanan v. United States*, 364 U.S. 587, 593 (1961).   In order to prove conspiracy, "[t]he government need not show that a defendant participated in all aspects of the conspiracy; it need only prove that the defendant was a party to the general conspiratorial agreement."  *United States v. Avery*, 128 F.3d 966, 971 (6th Cir. 1997).   "Moreover, a defendant's knowledge of and participation in a conspiracy may be inferred from his conduct and established by circumstantial evidence."  *United States v. Martinez*, 430 F.3d 317, 330 (6th Cir.2005) (citing *United States v. Salgado*, 250 F.3d 438, 447 (6th Cir.2001)).

In defense of the conviction on the conspiracy count, the Government has cited *United States v. Adair*, 436 F.3d 520 (5th Cir. 2006).   In *Adair*, the defendant was charged with conspiracy to commit money laundering, and made the same argument as Defendant in the instant case now makes:  the Government failed to prove a conspiracy because it failed to prove that the funds in question were "in fact" illegal, as is required under the statute defining the substantive offense that was the object of the conspiracy, 18 U.S.C. § 1956(a)(3)(B).  The *Adair* court, hearkening back to established Fifth Circuit precedent, stated that

> The critical error in the defendant['s] position is its presumption that a conspiracy charge must also describe the legal elements that comprise the substantive crime that is the object of the conspiracy. It is settled law that conspiring to commit a crime is an offense wholly separate from the crime which is the object of the conspiracy. Thus, we have consistently held that a conspiracy charge need not include the elements of the substantive offense the defendant may have conspired to commit.

*Adair*, 436 F.3d at 525.

As stated above, such a principle is long-standing throughout the circuits.  Furthermore, there is sufficient evidence in the record that Defendant believed that the funds in question were from South American drug dealers, and needed to be channeled through what would appear to be

legitimate business transactions.  With this understanding, Defendant agreed with Agent Tanza and co-defendant Miller to use the cash from the alleged drug dealers to purchase both the diamond and the Tyson estate.  That the funds were actually from the government and not from illegal activities is irrelevant.  The Court finds that Defendant's argument lacks merit.

      6.    <u>Sufficiency and manifest weight of the evidence</u>

Defendant argues that there was insufficient evidence to support his convictions, and that those convictions were contrary to the manifest weight of the evidence.  First, he argues that the conspiracy charge was not supported by any evidence that he knew that the purchase of the diamond and the Tyson estate was structured to conceal or disguise the nature, location, source, ownership, or control of the purchase money.  Second, he contends that convictions on the three money laundering counts were against the manifest weight evidence because the evidence did not show that he intended the wire transfers to conceal the source of any of the purchase money.  Finally, he again urges that his conviction was actually a result of entrapment, and that there was no evidence produced to support the Government's claim that he was predisposed to commit the crimes for which he was convicted.

When faced with a claim that the evidence was insufficient to support a conviction, the reviewing court, "while reviewing the record in the light most favorable to the prosecution, should grant relief only if it is found that upon the record evidence adduced at the trial, no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *United States v. Abner*, 35 F.3d 251, 253 (6th Cir. 1994) (citing *Jackson v. Virginia*, 443 U.S. 307, 324 (1979)).  "A defendant claiming insufficiency of the evidence bears a very heavy burden.  On review, all evidence must be construed in a manner most favorable to the government. Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not

remove every reasonable hypothesis except that of guilt." *Abner*, 35 F.3d at 253 (citations omitted).

In considering a Fed. R. Crim. P. 33 challenge to a conviction based upon the manifest weight of the evidence, the Court "can consider the credibility of the witnesses and the weight of the evidence to insure that there is not a miscarriage of justice.  It has often been said that he/she sits as a thirteenth juror." *United States v. Ashworth*, 836 F.2d 260, 266 (6th Cir.1988) (internal quotation omitted).  Although a defendant may point to evidence that supports his theory of the case, the jury is under no obligation to believe that evidence or to give it more weight than the evidence presented by the prosecution.  *See United States v. Grimes*, 438 F.2d 391, 393-94 (6th Cir. 1971).

The Court will first dispose of Defendant's claims regarding the sufficiency of the evidence at trial.  He challenges his conviction on the conspiracy count because he claims the Government could produce no evidence that he knew that the purchases of the Tyson estate and the diamond were intended to conceal the source of the funds.  At trial, the Government produced evidence that Defendant knew that the source of the funds was "huge drug dealers."  It also produced evidence that the Defendant knew that the participants in the transaction needed to channel the money through seemingly legitimate businesses.  That Defendant's attorney repeatedly called attention to Defendant's desire to deal in wire transfers does not negate that the Government produced quantities of evidence reflecting Defendant's knowledge, which this Court finds was sufficient to support a conviction.

He next reiterates his argument regarding the entrapment defense, and asserts that the Government failed to produce sufficient evidence of predisposition to negate that defense and to support his conviction.  The Court has already addressed Defendant's argument that he has

proven entrapment as a matter of law.  However, it now notes that the Government did produce recordings at trial in which Defendant stated that he previously built boats and sold them for cash to drug dealers in Miami.  It also produced evidence that Defendant knew he was dealing with money from South American drug dealers, and that he specifically discussed various ways he could get the cash to appear as if it had come from a legitimate source, such as funneling it through a limited liability corporation or a trust.  This evidence was sufficient to present the issue of predisposition to the jury, and to support the jury's conclusion that Defendant was in fact predisposed to commit the crimes with which he was charged.

Defendant's final argument is that the jury's verdict on the three substantive money laundering counts was contrary to the weight of the evidence because it did not prove that Defendant intended to conceal the source of the funds used to purchase the diamond and the house.  However, the Court disagrees.  The Government produced ample evidence among the recorded conversations of Defendant's awareness of the purpose of these purchases, and of his intention to obscure the source and nature of the funds used.  The jury could choose to believe either account, and that it chose to believe the Government's was not error, based on the evidence it had before it.

For these reasons, the Court finds that Defendant's convictions were both supported by sufficient evidence and were not contrary to the manifest weight of that evidence.  Defendant's objections are without merit.

7.    Conspiring with only a government agent

Defendant alleges that the Government failed to prove that he had conspired with anyone other than Agent Tanza.  The Court disagrees.  The Government produced overwhelming evidence that co-defendant Miller arranged the meeting between Agent Tanza and Defendant,

20

and that he continued to be involved in the transactions between the two, making assurances to Agent Tanza that the diamond was genuine, and guaranteeing that there were papers to that effect.  In addition, Scott Ramsey was directly involved in the discussions between Agent Tanza and Defendant regarding the transfer of funds, in that he was present for a number of them, including those that occurred in Las Vegas and at Defendant's attorney's office.  The Government also produced evidence at trial that both co-defendant Miller and Ramsey were supposed to receive a portion of the proceeds from the transactions.  Based upon this evidence, the Court finds that Defendant's argument is without merit.

       8.    <u>Tampering with evidence</u>

Defendant's final argument is that his conviction should be vacated and that he should be granted a new trial based on an alleged anomaly contained in the Government's recording of a November 2, 2006, conversation between Defendant and Agent Tanza (as Rizzo).[4]  Defendant claims that his counsel was notified by the investigator on May 14, 2007, that he believed that the November 2 recording had been intentionally edited.  The date that defense counsel was notified was the date on which Defendant's trial began.  However, Defendant's counsel did not bring this allegation to the Court's attention until after the presentation of evidence had concluded and the Court was preparing to charge the jury and to begin closing arguments.

A defendant's motion for a new trial based on his claim of newly discovered evidence should be granted only if he has demonstrated that "(1) the new evidence was discovered after trial; (2) the evidence could not have been discovered earlier with diligence; (3) the evidence is material and not merely cumulative or impeaching; and (4) the evidence would likely produce an

---

[4] The Court takes particular note of the fact that Defendant did not present to an investigator what he alleges to have been fifty hours of recorded conversations until April 2007, a matter of weeks before his trial was to begin.  Defendant then calls the Court's attention to the fact that the investigator was further delayed by Defendant's inability to pay the required retainer.

acquittal." *United States v Hopper*, 384 F.3d 252, 258 (6th Cir. 2004), *rev'd on other grounds*, 543 U.S. 1136 (citations omitted).

Since the conclusion of the trial, Defendant has paraded multiple "experts" before the Court to attest to an alteration of that recording.  On October 15, 2007, the Court held a hearing on the issue, which lasted over six hours.  Defendant's witnesses offered testimony that a "click" was audible in the November 2 recording, and that it likely represented approximately two seconds' worth of conversation that had been altered or deleted in some fashion.  However, these witnesses included individuals who had no experience in this type of recording, including a music professor from the University of Toledo who also operated a recording studio and an audio analysis and editing business, but who had never opined on issues of forensic analysis of digital recordings.  Neither he nor his employees, whom Defendant also produced, possessed the expertise to render an opinion on the type of digital recording at issue here.

Defendant's final proposed expert was James B. Reames, a former employee of the FBI who had worked with sound recordings and who now is the president of a forensic laboratory that analyzes audio recordings, among other things.  He has opined that the November 2 recording does contain an anomaly.  Mr. Reames states that an occurrence such as this can be caused by:  "(1) a change in the recording environment; (2) a recording system malfunction; and/or (3) editing or altering the recording."  (Defendant's Post-Hearing Brief and Motion for Further Evidentiary Hearing, Exhibit E, para. 8.)  Mr. Reames claims that, based on his training, experience, and examination, there is no change in the recording environment, thus eliminating the first possible cause.  He next states that he "did not find evidence of a recording system malfunction."  *Id.*  He bases these conclusions on the mere fact that he found the recording before and after the purported anomaly to be normal.

After eliminating to his satisfaction the possibility of environmental disturbances, Mr. Reames contends that the recording was either altered or was subject to a malfunction.  In an effort to eliminate the latter, Mr. Reames suggests that if the digital recorder were made available to him, along with its manuals, he could determine if the recording is working correctly or if it is prone to malfunctions.  He also requests that the Government make available to him a mirror of the hard drive from the computer that was used to download the recording.  The Government presented opposing testimony at the hearing that this specific recording device is top secret and is not available for public inspection.  The Government's witnesses testified that, if the public were aware of what the device looked like and how it worked, it would compromise the work and safety of undercover agents using this device, and that the criminal element would likely develop counter-measures to reduce its effectiveness.

Although Mr. Reames's qualifications are greater than any of the other so-called experts produced by Defendant, there is not enough evidence before the Court to justify its ordering the FBI to make a mirror hard drive for Mr. Reames's inspection or to produce the digital recorder for inspection by anyone outside of the Government.  The safety of undercover agents using the recording device at issue in this matter is a concern to the Court.  In addition, the Court would require that the hard drive on which this information was stored be imaged only under extraordinary circumstances in which more substantial evidence had been produced by a defendant.  In this case, Defendant's evidence amounts to little more than speculation. Moreover, the Government introduced evidence at the hearing that the recording device was not capable of being turned on and off by the wearer, and it outlined the conspiracy necessary among the different departments at the FBI to remove a portion of a recording from this type of device.

The Court notes that it is Defendant's burden to produce evidence sufficient to demonstrate that a judgment of acquittal or a new trial should be granted.  Defendant has produced testimony and averments that this "anomaly" occurs in only one of the multiple conversations recorded.  Defendant has also failed to present evidence as to what he believes occurred during that time.  Although he has suggested that a threat was made by the Government's agent, he has produced no evidence to substantiate this claim even though there was at least one other witness to the conversation, namely Scott Ramsey.  The recording reflects no change in the flow of the conversation after the "click" that would indicate that a portion of it had been removed or that the tone of the conversation had altered greatly through the duration of the "click."  Furthermore, the conversation that occurred after the "anomaly" demonstrates that the Defendant was a willing participant in the conspiracy:

| | |
|---|---|
| Defendant: | The cash is devastating because of my situation, the cash is a problem. |
| Rizzo: | Talk to Mickey, talk to, what, maybe there's some, another outlet. |
| Defendant: | But I wanna come away from here with a deal. |
| Rizzo: | Oh, you're gonna come away with a deal. |
| Defendant: | Cause I don't wanna come from here with, we might have a deal. |
| Rizzo: | No. No. You're gonna come away with a deal.  I promise you're gonna come away with a deal . . . |

The Court finds it unnecessary to proceed further with this issue and subject the recording to further testing.  Defendant's delay in seeking an expert to examine these recordings is compounded by his delay in bringing this matter to the Court's attention before each side had presented its case in chief.  That he chose to wait until the very moment at which the Court was prepared to charge the jury constitutes unreasonable delay.  Furthermore, regardless of the issue of delay, Defendant has failed to produce evidence that this recording was edited at all, that any alleged edit was material, or that his purported evidence would in any way indicate a likelihood

of acquittal were it presented to a factfinder.  Defendant's motion is without merit and is denied.

## CONCLUSION

For the above stated reasons the Court finds that Defendant has failed to satisfy his burden to demonstrate that the Court should grant a judgment of acquittal or a new trial and therefore DENIES his motion.  (Doc. #104.)  In an abundance of caution, the Court DENIES the Government's motion to strike.  (Doc. #211.)

IT IS SO ORDERED.

DATED:  March 17, 2008                    _____/s/ John R. Adams_____
                                          JUDGE JOHN R. ADAMS
                                          UNITED STATES DISTRICT COURT